26CA0877 Peo in Interest of Rubalcaba 07-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 26CA0877
Pueblo County District Court No. 26MH30054
Honorable Gregory J. Styduhar, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Christopher Adrian Rubalcaba,

Respondent-Appellant.

---

ORDER AFFIRMED

Division IV
Opinion by JUDGE LUM
Welling and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

---

Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1     Christopher Adrian Rubalcaba appeals the district court's order authorizing the involuntary administration of medication.  We affirm.

## I.     Background

¶ 2     Rubalcaba was committed to the Colorado Mental Health Hospital in Pueblo (the hospital) in February 2026 after being found incompetent to proceed in a criminal case.  According to the affidavit of his treating psychiatrist at the hospital, Dr. Martin Ahern, Rubalcaba suffers from schizophrenia and presents with thought and speech disorganization, a tangential thought process, and grandiose delusional thought content.  He was prescribed Zyprexa but refused to take it for several weeks.

¶ 3     After Dr. Ahern examined Rubalcaba and recommended additional medications, the People petitioned the district court to authorize their involuntary administration in order to prevent a significant and long-term deterioration in Rubalcaba's mental condition and/or the likelihood of Rubalcaba causing serious harm to himself or others.

¶ 4     The district court held an evidentiary hearing at which Dr. Ahern and Rubalcaba testified.  Dr. Ahern explained Rubalcaba's

1

disorder and accompanying symptoms. Dr. Ahern testified that Rubalcaba had reported an implausible personal history — for example, that he owns "Pepsi Wheeling Numeric Company" and was an ICU doctor. He also testified that Rubalcaba's condition was chronic and would result in a long-term decline in his cognitive function if left untreated. Dr. Ahern recommended Saphris (asenapine), Risperdal (risperidone), and Clozaril (clozapine). And he testified about the possible side effects of those medications.

¶ 5    Rubalcaba testified that he did not have a mental illness and that he was not a danger to himself or others. He did not want to take medication because he thought that a medication had previously caused blood in his stool. When asked if that medication was Zyprexa, he said he believed it was. He also said it caused shaking and nausea. He believed no other medications would help and he was worried about potential ulcers as side effects.

¶ 6    In a detailed ruling from the bench, the district court found that Rubalcaba had no insight as to his mental illness and was incapable of making informed treatment decisions. The court also found that Rubalcaba's condition significantly impaired his ability to independently appraise his needs. The court observed that

Rubalcaba's own testimony showed disorganization in his thought process. Rubalcaba acknowledged that he had written the statements about Pepsi ownership and his alleged ICU doctor training "on paperwork." The court credited Dr. Ahern's testimony that without treatment, Rubalcaba's condition would continue to decline severely.

¶ 7    Based on these findings, the district court granted the People's petition for the involuntary administration of medication.

## II.    Legal Principles and Standards of Review

¶ 8    A person who is involuntarily committed retains the right to refuse treatment. *See People v. Medina*, 705 P.2d 961, 971 (Colo. 1985). Even so, a court may authorize the involuntary administration of medication if the People prove the following elements by clear and convincing evidence:

> (1) the patient is incompetent to effectively participate in the treatment decision;
>
> (2) treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution;

(3) a less intrusive treatment alternative is not available; and

(4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

*Id.* at 963-64.[1] We determine whether the evidence, viewed as a whole and in the light most favorable to the People, is sufficient to support the court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. A physician's testimony alone may be sufficient to satisfy the *Medina* test. *Id.* at ¶ 30.

¶ 9 Applying the *Medina* test presents a mixed question of fact and law, meaning that we defer to the district court's factual findings if supported by the record but review its legal conclusions de novo. *People in Interest of R.C.*, 2019 COA 99M, ¶ 7. It is for the district court, as the fact finder, to determine witness credibility; the

---

[1] When involuntary administration of medication is sought solely for the purpose of rendering the defendant competent to stand trial, the test set forth in *Sell v. United States*, 539 U.S. 166, 180-81 (2003), typically controls. When, as here, the government seeks to involuntarily administer medications to further other purposes, such as those related to an individual's own interests "where refusal to take drugs puts his health gravely at risk," *id.* at 182, a court applies the test established in *People v. Medina*, 705 P.2d 961, 963-64 (Colo. 1985).

4

sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn from it. *Id.*

## III.  Discussion

¶ 10    Rubalcaba first argues that the district court's order didn't contain sufficient "individualized" findings under *Medina.* He also challenges the court's findings on the first, second, and fourth *Medina* elements.

## A.  Individualized Findings

¶ 11    Rubalcaba asserts that the district court's written order "consisted primarily of boilerplate findings and conclusory check-box determinations rather than individualized factual findings." He argues that the People failed to show why his concerns regarding gastrointestinal (GI) bleeding, stomach ulcers, prior medication-induced shaking, and other potential side effects did not overcome the state's interest in preserving his life and health. He also contends that generalized testimony regarding the effectiveness of psychiatric medication is insufficient; the evidence must connect the proposed medication plan to the specific individual and circumstances.

¶ 12    We reject that argument for two reasons.  First, Rubalcaba does not cite, and we are not aware of, any legal authority requiring detailed written findings.  Second, his argument ignores the fact that the court made detailed, specific oral findings on every *Medina* element.  The transcript is included in the record and contains seven pages of individualized findings.

## B.    The First *Medina* Element

¶ 13    The first *Medina* element requires a finding that the patient is incompetent to effectively participate in the relevant treatment decision.  *Medina*, 705 P.2d at 973.  A court may not order the involuntary administration of medication unless the patient is incapable of participating in decisions affecting his health.  *Id.*

¶ 14    Dr. Ahern testified that Rubalcaba's disorganized and delusional thinking (1) impairs his ability to meaningfully participate in conversations about "reality-based" risks and benefits; and (2) "significantly impairs his ability to accurately appraise his independent abilities and . . . resources," which means he is "unable to make safe and informed decisions about . . . how to meet his needs."  Additionally, he testified (and Rubalcaba confirmed during his own testimony) that Rubalcaba doesn't believe

6

he has a mental illness. As a result, Dr. Ahern opined that Rubalcaba is incompetent to effectively participate in treatment decisions.

¶ 15 The court credited Dr. Ahern's testimony and specifically noted that his testimony was "certainly consistent with" the court's own observation of Rubalcaba's testimony. Because Dr. Ahern's and Rubalcaba's testimonies support the court's conclusion that Rubalcaba was incompetent to participate in treatment decisions, we perceive no reason for reversal.

## C. The Second *Medina* Element

¶ 16 The second *Medina* element may be satisfied by showing either a significant and likely long-term deterioration or the likelihood of serious harm to self or others in the institution without the recommended medications. *Id.* To determine whether a patient is in danger of long-term deterioration, the court should consider the patient's need for the medication, including "the nature and gravity of the patient's illness, the extent to which the medication is essential to effective treatment, the prognosis without the medication, and whether the failure to medicate will be more harmful to the patient than any risks posed by the medication." *Id.*

¶ 17 The district court found that the recommended treatment is necessary to prevent a significant and long-term deterioration in Rubalcaba's mental condition. Specifically, the court observed that without treatment, a long-term deterioration in his mental health would potentially lead to severe issues such as further thought process decline. The court also found that without medication, Rubalcaba's condition could become "completely treatment-resistant."

¶ 18 The record supports the court's determination. Dr. Ahern testified that an individual who experiences a "prolonged, untreated psychotic state" or abrupt discontinuation of medication will have a "poorer response" to future treatment "such that their psychotic state . . . can become persistent and treatment resistant." He also testified that, without medication, Rubalcaba's condition "will lead . . . to cognitive decline" and "further impact his ability to independently manage his own affairs or meet his basic needs."

¶ 19 We therefore see no basis to disturb the district court's determination, and to the extent Rubalcaba asks us to second-guess witness credibility or draw different inferences from the testimony, we cannot do so. *See R.C.*, ¶ 7

## D. The Fourth *Medina* Element

¶ 20    In assessing the fourth *Medina* element — whether the patient's need for treatment is sufficiently compelling to override any legitimate interest in refusing treatment — a court must consider "whether the patient's refusal is bona fide and legitimate" and, if it is, "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution." *Medina*, 705 P.2d at 974.

¶ 21    Again, the record supports the court's conclusion that the state's interest in preserving Rubalcaba's life and health overcame his interest in avoiding potential side effects of the medications.

¶ 22    The court considered Rubalcaba's concerns. It acknowledged Dr. Ahern's testimony that the new proposed medications could cause side effects, including some GI side effects, but it also noted Dr. Ahern's testimony that Rubalcaba would be closely monitored and treated for side effects. Regarding Rubalcaba's specific concern that one of the medications had once caused an ulcer, the court credited Dr. Ahern's testimony that the ulcer was most likely a

coincidence and was not correlated with using that medication. The court also found — again supported by Dr. Ahern's testimony — that failing to medicate Rubalcaba would be more harmful than the risk posed by using the medications because of the likelihood of long-term deterioration and cognitive decline. Accordingly, we see no reason to disturb the district court's conclusions on this element.

## IV. Disposition

¶ 23    The order is affirmed.

JUDGE WELLING and JUDGE SCHOCK concur.